[Cite as *State v. Sellers*, 2012-Ohio-5546.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Sheila G. Farmer, J. |
| -vs- | : | |
| | : | |
| JOEL E. SELLERS | : | Case No. 12CAA020012 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                                          Pleas, Case No. 11CRI-10-0553



JUDGMENT:                                        Affirmed



DATE OF JUDGMENT:                          November 26, 2012



APPEARANCES:

For Plaintiff-Appellee                            For Defendant-Appellee

CAROL HAMILTON O'BRIEN                 LOGAN PHILIPPS
KYLE ROHRER                                    125 North Sandusky Street
140 North Sandusky Street                   Delaware, OH  43015
Delaware, OH  43015

*Farmer, J.*

{¶1}   On March 23, 2011, the Delaware County Grand Jury indicted appellant, Joel Sellers, on one count of murder in violation of R.C. 2903.02.  Said charge arose from the shooting death of appellant's friend, George McArthur, following a confrontation.

{¶2}   On October 21, 2011, appellant was re-indicted on the murder count with an added firearm specification and one count of involuntary manslaughter with a firearm specification in violation of R.C. 2903.04 and 2941.145, two counts of having a weapon while under disability in violation of R.C. 2923.13, one count of illegal cultivation of marijuana in violation of R.C. 2925.04, one count of possession of marijuana in violation of R.C. 2925.11, and one count of illegal possession of drug paraphernalia in violation of R.C. 2925.14.

{¶3}   Prior to trial, the trial court dismissed one of the having a weapon while under disability counts.  A jury trial commenced on December 12, 2011.  The jury found appellant guilty of voluntary manslaughter as an inferior degree to the murder count, and guilty of the remaining counts.  By judgment entry filed January 24, 2012, the trial court sentenced appellant to a total aggregate term of ten years in prison.

{¶4}   Appellant filed an appeal and this matter is now before this court for consideration.  Assignments of error are as follows:

I

{¶5}   "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED THE DEFENDANT THE ABILITY TO TESTIFY AS TO SPECIFIC INSTANCES OF VIOLENT CONDUCT BY THE DECEDENT."

II

{¶6}  "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE STATE OF OHIO TO PRESENT PORTIONS OF A TRANSCRIPT FROM A VIDEO RECORDED INTERVIEW WITHOUT REQUIRING, UPON REQUEST BY THE DEFENDANT, THAT THE BALANCE OF THE VIDEO RECORDING BE PLAYED."

III

{¶7}  "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED A STATE WITNESS TO TESTIFY AS EXPERTS AND OFFER OPIONIONS (SIC) AS TO DISTANCE BETWEEN THE FIREARM AND THE DECEDENT AND THE REACTION OF A HUMAN SOLELY UPON BEING HIT BY BULLET."

IV

{¶8}  "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT RULED THAT DEFENDANT COULD NOT INTRODUCE EVIDENCE OF POST TRAUMATIC STRESS DISORDER WITHOUT EXPERT TESTIMONY BUT ALLOWED THE INTRODUCTION OF A POSITIVE DRUG SCREEN WITHOUT EXPERT TESTIMONY."

V

{¶9}  "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED THE DEFENDANT'S MOTION TO DISMISS COUNTS 2, 3, 5, 6, 7 OF THE INDICTMENT BASED ON SPEEDY TRIAL GROUNDS."

VI

{¶10} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE INSTRUCTION OF VOLUNTARY MANSLAUGHTER."

VII

{¶11} "THE JURY'S GUILTY VERDICTS ON COUNTS ONE, TWO, THREE AND FOUR WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT THE TRIAL OF THIS MATTER."

VIII

{¶12} "THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."

I

{¶13} Appellant claims the trial court erred in denying him the ability to present evidence on specific instances of the victim's violent conduct as such evidence was necessary to prove he was in imminent danger of death or bodily harm and his state of mind at the time of the incident.  We disagree.

{¶14} The admission or exclusion of evidence lies in the trial court's sound discretion.  *State v. Sage* (1987), 31 Ohio St.3d 173.  In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.  *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217.

{¶15} In support of his position, appellant cites this court's opinion in *State v. Davis,* 5th Dist. No. 2003 CA 429, 2004-Ohio-7056, wherein this court stated the following at ¶ 19:

In meeting the burden to prove self-defense, the defendant must establish in part a bona fide belief that he was in imminent danger of death or great bodily injury. *State v. Robbins* (1979), 58 Ohio St.2d 74, 80, 388 N.E.2d 755. In order to prove the defendant's state of mind, a court can allow the defendant to testify about the victim's reputation for violence and his knowledge of specific instances of the victim's prior violent conduct. See, e.g. *State v. Baker* (1993), 88 Ohio App.3d 204, 208, 623 N.E.2d 672.

{¶16} In response, the state argues the case of *State v. Barnes,* 94 Ohio St.3d 21, 2002-Ohio-68, syllabus, wherein the Supreme Court of Ohio held, "[a] defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor. (Evid.R. 404[A] and 405, construed and applied.)"

{¶17} No proffer of testimony was made on the record under Evid.R. 103(A)(2); therefore, it is unclear what the specific instances were.

A party may not predicate error on the exclusion of evidence during the examination in chief unless *two* conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by

proffer *or* was apparent from the context within which questions were asked.

*State v. Gilmore,* 28 Ohio St.3d 190 (1986), syllabus.

{¶18}  The trial court permitted testimony as to prior incidents involving appellant and the victim, but not to incidents between the victim and others that appellant was aware of.  T. at 655-656.

{¶19}  We are unable to address the correctness of the ruling in light of *Davis* or *Barnes* as the testimony was not preserved for review and the colloguy between the trial court and counsel is not of assistance.

{¶20}  Assignment of Error I is denied.

II

{¶21}  Appellant claims the trial court erred in permitting the state to present parts of his video recorded interview with police via a written transcript without requiring the balance of the video recorded interview to be played in violation of Evid. R. 106 and 1002.  We disagree.

{¶22}  Evid.R. 106 governs remainder of or related writings or recorded statements and states, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it."

{¶23} Evid.R. 1002 governs requirement of original and states, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio."

{¶24} The transcript was preserved for the record as State's Exhibit No. 82 and was used at trial, but was not admitted and was kept by the Court Reporter. T. at 633-634, 772-773.

{¶25} Delaware City Police Detective Michael Bolen testified on direct examination as to his interview with appellant at the police department following the shooting. T. at 609-613. The transcript was not used during this testimony as it appears Detective Bolen was testifying from his memory. Therefore, Evid.R. 106 is not applicable to Detective Bolen's testimony.

{¶26} On defense, appellant testified on his own behalf regarding the incident and to what was recorded on the police cruiser audio after it arrived on the scene. T. at 672-685, 689-690. On cross-examination, the prosecutor used the transcript to question appellant about the differences between his testimony and what he had told Detective Bolen during his interview. T. at 714-716, 724-726, 734-736. Appellant claimed his statements to Detective Bolen were "[n]ot complete and full by any means." T. at 743.

{¶27} In rebuttal, defense counsel recalled Detective Bolen and refreshed his memory of appellant's statements not from the transcript, but from his narrative in the police report. T. at 748. The prosecutor asked Detective Bolen to read specific

passages from the written transcript.  T. at 757-767; State's Exhibit No. 82, pages 5, 8, 10, 11, 12, 19, 21, and 23.  Defense counsel objected to the use of the transcript; however, defense counsel also used the transcript on cross-examination of Detective Bolen.  T. at 758, 769-770.  The prosecutor did not request the admission of State's Exhibit No. 82.  T. at 772-773.

{¶28}  No request pursuant to Evid.R. 106 was made by defense counsel.  We note harmless error is described as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  Crim.R. 52(A).  Overcoming harmless error requires a showing of undue prejudice or a violation of a substantial right.  We find no such showing sub judice.

{¶29}  In reviewing State's Exhibit No. 82, we find no showing that the admission of the balance of the transcript would have affected the outcome of the trial.  It would have only added to the inconsistencies of appellant's own testimony.

{¶30}  Upon review, we find the trial court did not err in permitting the state to use parts of the transcript without requiring the balance of the transcript to be presented.

{¶31}  Assignment of Error II is denied.

III

{¶32}  Appellant claims the trial court erred in permitting testimony by three witnesses as to their opinions about the distance between the gun and the victim based upon stippling and the pattern of unburned powder, and the reaction of a body upon being shot.  We disagree.

{¶33} Under Evid.R. 104(A), the trial court is the primary gatekeeper "concerning the qualification of a person to be a witness." In consideration of this rule, Evid.R. 702 provides for the testimony by experts and states the following:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶34} Special Agent Gary Wilgus testified as to his experience with forensic and trace evidence over his sixteen years with the Ohio Bureau of Criminal Investigation. T. at 264-268. Agent Wilgus specifically testified to the following at 305-306:

Q.      When you - - based on the amount of stippling that is or is not present, did you come to a general conclusion about how far away the gun would have been from the wound?

A.      Well, again, it's dependent on the type of firearm, the length of the muzzle, and the ammunition used. In this particular case, the testing was done. And, you know, we can say that it was likely greater than 24 inches away.

{¶35} No objection was made to the testimony. However, it is clear from Agent Wilgus's experience and knowledge, he was qualified to offer the opinion.

{¶36} James Smith, employed with the Ohio Bureau of Criminal Investigation as the current Crime Laboratory Director, has been a forensic examiner since 2002 and testified to his training and background. T. at 382-386. Director Smith testified to performing firearm testing for over five years and receiving scientific training. T. at 400-401, 421-422. Director Smith explained the following at 415-416:

Q.      And how does stippling relate to, I guess, distance determination?

A.      Well, when you're doing a distance determination, you can see particles that have hit whatever you're shooting at. In this case, I used

cardboard, I use white cardboard at different distances. So you could see where that burning and unburned gunpowder is striking the cardboard. And you can do it at different distances to create patterns.

Q.      Does the pattern decrease the farther you get away?

A.      Yes, the pattern is kind of - - can be tricky. If it's a contact shot, there may not be a pattern because all the gunpowder enters the wound. As soon as you start bringing the muzzle of the firearm away from the target, that pattern will go from very dense - - and starts off small, but as you come out, it's a little less dense and little wider, and as you keep going out, it gets a little less dense and narrower again because the cloud has dissipated.

Now, the spray of the actual unburned will keep spreading, but the actual cloud and the smoke will dissipate too.

So, the closer you are coming away - - a contact, you may not have a pattern, you'll have blast damage, but you may not have a pattern. As you start going away you're going to see a dense, heavy pattern, and as you go away, it will dissipate and you will get a less sparse pattern, to the point where you don't even have a pattern anymore and now you just have random particles hitting the farther you go out.

{¶37} Director Smith then explained his testing procedures, by using the autopsy photographs and a series of firings beginning at three inches and increasing to four feet. T. at 418-420, 422-423. Director Smith opinioned the following at 429-430:

Q.      Did you compare your test patterns with the autopsy photos that you'd obtained previously?

A.      I tried to.

Q.      Were you able to make any range determinations when comparing them?

A.      I was somewhat in conclusive and it had partly to do with the fact that I didn't see what I considered to be a pattern on the victim.

Now, there's things that can effect whether or not there's a pattern, there could have been an intervening object.  I don't know the details of it.  However, from the patterns I produced and what I was looking at in the picture, I did not see a pattern on the victim, therefore, I determined that it was greater than 18 inches.

Q.      Is that the best you can do with a reasonable degree of scientific certainty?

A.      Yes, sir.


{¶38} As we noted, the issue is not the admissibility of the evidence, but the credibility of the expert witness's opinion which is subject to the requirements of Evid.R. 702(A).  From our review of Director Smith's testimony and his qualifications as an expert, we find the firearm simulation test established and fulfilled the requirements of the rule.  We note defense counsel strenuously cross-examined Director Smith on the testing procedures to challenge the credibility of his opinion.  T. at 434-441.

{¶39} As for the position of the body, the victim was found on his back. State's Exhibit No. 15A. Appellant testified the victim was bent over him punching him. T. at 678-679. After shooting the victim in the neck, appellant observed the victim "leaning against some plastic storage receptacles that I had." T. at 685. He then helped the victim "down to the ground." T. at 686.

{¶40} Director Smith testified the victim's body, upon being shot while leaning forward, would likely fall forward not backwards. T. at 433. From his experience of seeing videos of actual shootings, Director Smith testified at length about the velocity of a bullet and the effect of a bullet hitting a body, specifically a bullet from the same gun used sub judice. T. at 431-433. Given that Director Smith's qualifications were clearly established in the field of forensic science, we find no error in admitting the testimony relative to reaction of a body upon being shot.

{¶41} Coroner Obinna Ugwu also testified to the reaction of a body upon being shot. T. at 364. He stated, "I really would like to say, I don't think there's any definite scientific way of predicting this, people tend to react differently. The exact motion he was in when the projectile penetrated his body, would determine how he would fall eventually." T. at 364-365. Defense counsel cross-examined him on this issue. T. at 370-371. Coroner Ugwa testified to his qualifications as a pathologist and his education and training in medicine, forensic pathology, and determining the cause and manner of death. T. at 346-347. We find no error in admitting this complained of testimony.

{¶42} Upon review, we find the trial court did not abuse its discretion in admitting the complained of testimony of Agent Wilgus, Director Smith, and Coroner Ugwu.

{¶43} Assignment of Error III is denied.

IV

{¶44} Appellant claims the trial court erred in denying testimony about post traumatic stress disorder without an expert witness, but permitted the state to introduce evidence of a positive drug screen without expert testimony. We disagree.

{¶45} Prior to trial, defense counsel stated he had documentation from the U.S. Army indicating appellant was discharged for having post traumatic stress disorder. T. at 10. He explained he wanted to present this document as an exhibit during his case and have appellant testify as to whether he received any counseling or advice. T. at 10-11. State's Exhibit No. 49 which was a Memorandum from the Department of the Army, clearly stated appellant's discharge was the result of a positive drug test for marijuana. The parties stipulated to the authenticity of this exhibit. T. at 13.

{¶46} Upon further discussion, the trial court limited appellant's testimony about post traumatic stress disorder without expert testimony. T. at 16-17. Defense counsel clarified, "So I understand the limits of this, Your Honor. If I were to ask Mr. Sellers if he was being medically disqualified from the Army, without going into a diagnosis or anything, that would be permissible, he received notice from them." T. at 17. The trial court stated, "I don't have any problem with that." Id.

{¶47} Appellant's argument appears to be that the discharge memorandum for a positive drug screen should not have been admitted if the issue of post traumatic stress disorder was not also included.

{¶48} Appellant testified about his discharge as follows at 668:


Q.      What was the reason you began using marijuana again?

A.      It's been a pretty good easer of anxiety.  It [marijuana] does kind of calm the nerves.  And it is - - many doctor's opinions, is a respectable treatment for anxiety issues.

Q.      Now, when the Army sent you on the medical discharge, had they sent you to get any sort of treatment?

A.      They had.  I was currently making visits to the Veteran's Association down in Columbus and I was - - I had seen, for the last six months in Iraq, I was seeing a psychologist.  And upon returning, I saw a psychologist and was put on medication.


{¶49} Although we do not have a proposed exhibit relative to post traumatic stress disorder, there is evidence in the record of appellant suffering from anxiety and depression after returning from active duty.

{¶50} State's Exhibit No. 49 was admitted and included a positive drug test result.  T. at 627.  Appellant freely admitted he was a cultivator of marijuana for his own use.  T. at 699, 706-708.  In addition, State's Exhibit No. 51 is a positive drug test for marijuana of the items seized from appellant's bedroom, along with an accompanying affidavit.

{¶51} Upon review, we find the trial court did not abuse its discretion as argued by appellant.

{¶52} Assignment of Error IV is denied.

V

{¶53} Appellant claims the trial court erred in not dismissing Counts 2, 3, 5, 6, and 7 of the indictment on speedy trial grounds. We disagree.

{¶54} Appellant had signed a time waiver on the original murder count of the March 23, 2011 indictment. He argues the time waiver did not apply to the additional counts as the state knew of the underlying facts of the counts at the time of the March 23, 2011 indictment; therefore, his speedy trial rights were violated.

{¶55} In support of his argument, appellant cites the case of *State v. Adams,* 43 Ohio St.3d 67 (1989), 68, wherein the Supreme Court of Ohio quoted the following from *State v. Clay*, 9 Ohio App.3d 216 (1983), 218: "***[W]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge." The *Adams* court reasoned at 70, "a knowing and intelligent waiver cannot be made until all the facts are known by the accused, which includes knowing the exact nature of the crime he is charged with."

{¶56} In the cited counts, appellant was indicted for involuntary manslaughter, having a weapon while under disability (drug dependency), and three drug related offenses. Appellant argues at the time of the March indictment, the state knew of Mr. McArthur's death, the presence of marijuana plants, seeds, residue, and paraphernalia in his bedroom, and his previous drug conviction in municipal court. T. at 154, 189, 213, 223, 237.

{¶57} Although the state was aware of the positive test results for drugs on April 1, 2011, it was not until an August 7, 2011 defense expert report by Dr. John Fabian that appellant's drug dependency was known and then reconfirmed by the state on September 26, 2011.

{¶58} After an analysis of the facts, the trial court dismissed a second count of having a weapon while under disability, Count 4. In doing so, the trial court meticulously addressed the requirements of *State v. Davis,* 2nd Dist. No. 2002-CA-43, 2003-Ohio-4839, and *State v. Baker,* 78 Ohio St.3d 108, 1997-Ohio-229.

{¶59} In *Davis,* our brethren from the Second District discussed the *Adams* decision and noted the signing of a time waiver in a previous indictment did not carry over to a subsequent indictment. However, this black letter law is tempered by an examination of the subsequent offenses:

***the concerns expressed in *Adams* are absent when the subsequent charge is a lesser-included offense of an initial charge. Specifically, in such cases, waiving defendants are aware of the exact nature of the crimes with which they are charged, since "the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed." *State v. Deem* (1988), 40 Ohio St.3d 205, 206, 533 N.E.2d 294, paragraph three of the syllabus. Because the greater offense requires proof of one or more additional elements, it may involve considerations of defense that would not be

contemplated in defending against the lesser-included offense, but not vice versa.

***We have likewise said that "[i]nvoluntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or misdemeanor." *State v. Lawrence* (Dec. 19, 1997), Montgomery App. No. 16317, 1997 WL 822719. Thus, because Davis was charged with murder under R.C. 2903.02, his speedy trial waiver for that charge applied to the lesser-included offense of involuntary manslaughter under R.C. 2903.04.

*Davis,* at ¶ 32-33.

{¶60} This coincides with the trial court's decision in not dismissing Count 2, the involuntary manslaughter count, because it was a lesser-included offense of the original murder charge. Appellant's time waiver from the original indictment applied to the subsequent indictment for involuntary manslaughter.

{¶61} In the *Baker* case, the Supreme Court of Ohio stated the following at 111-112:

To require the state to bring additional charges within the time period of the original indictment, when the state could not have had any knowledge of the additional charges until investigating later-seized evidence, would

undermine the state's ability to prosecute elaborate or complex crimes. In so holding, we recognize that in construing the speedy-trial statutes, we must balance the rights of an accused with the public's interest in "obtaining convictions of persons who have committed criminal offenses against the state." *State v. Bonarrigo* (1980), 62 Ohio St.2d 7, 11, 16 O.O.3d 4, 6-7, 402 N.E.2d 530, 534.

***When additional criminal charges arise from facts distinct from those supporting an original charge, or the state was unaware of such facts at that time, the state is not required to bring the accused to trial within the same statutory period as the original charge under R.C. 2945.71 *et seq.*

*See also, State v. Brown,* 5th Dist. No. 2007CA00129, 2008-Ohio-4087, and *State v. Nichols,* 5th Dist. No. 2009-CA-0032, 2009-Ohio-3160.

{¶62} The issue is whether the state had new and additional facts that were not known at the time of the original indictment. The lab results were not available until April 1, 2011, after the first indictment of March 23, 2011. Also, appellant's drug dependency was not known until September 26, 2011.

{¶63} Upon review, we find the trial court did not err in not dismissing the cited counts.

{¶64} Assignment of Error V is denied.

VI

{¶65} Appellant claims the trial court erred in instructing the jury on voluntary manslaughter as it was not requested and is not a lesser included offense of murder. We disagree.

{¶66} Voluntary manslaughter is defined in R.C. 2903.03(A) as, "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy."

{¶67} In its brief at 26, the state concedes voluntary manslaughter is not a lesser included offense of murder, but argues it is a crime of inferior degree. R.C. 2945.74; Crim.R. 31(C). As such, voluntary manslaughter is a mitigating factor to the purposeful killing of another (murder). In *State v. Rhodes,* 63 Ohio St.3d 613 (1992), 617-618, footnote omitted, the Supreme Court of Ohio stated the following:

R.C. 2903.03 defines voluntary manslaughter as a single offense that, under certain circumstances, permits a defendant to mitigate a charge of murder to manslaughter. The crime comprises elements that must be proven by the prosecution and mitigating circumstances that must be established by the defendant.***Under the statute, the jury must find a defendant guilty of voluntary manslaughter rather than murder if the prosecution has proven, beyond a reasonable doubt, that the defendant knowingly caused the victim's death, and if the defendant has established

by a preponderance of the evidence the existence of one or both of the mitigating circumstances.

Voluntary manslaughter is, by our prior definition, an inferior degree of murder. *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576, 592. Accord *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph two of the syllabus. Thus, if a defendant on trial for murder or aggravated murder (or the prosecution in such trial) produces evidence of one or both of the mitigating circumstances set forth in R.C. 2903.03, that evidence will be sufficient to entitle a defendant to an instruction on voluntary manslaughter as an inferior degree of murder if under any reasonable view of the evidence, and when all of the evidence is construed in a light most favorable to the defendant, a reasonable jury could find that the defendant had established by a preponderance of the evidence the existence of one or both of the mitigating circumstances. *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 532, 415 N.E.2d 303, 308.

{¶68} Upon review, we find the trial court did not err in instructing the jury on voluntary manslaughter.

{¶69} Assignment of Error VI is denied.

VII

{¶70} Appellant claims his convictions for voluntary manslaughter, involuntary manslaughter, and having a weapon while under disability were against the manifest weight of the evidence.  We disagree.

{¶71} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin* (1983), 20 Ohio App.3d 172, 175.  See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52.  The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *Martin* at 175.

VOLUNTARY MANSLAUGHTER

{¶72} As stated supra, voluntary manslaughter is defined in R.C. 2903.03(A) as, "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy."

{¶73} Appellant argues the evidence does not support this conviction because there was no evidence to establish he knew where the victim was when he fired the gun and his sole intention was to scare the victim.

{¶74} The requisite culpable mental state for voluntary manslaughter is "knowingly" which is defined as, "[a] person acts knowingly, regardless of his purpose,

when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). It is well established that one may be presumed to intend results which are the natural, reasonable, and probable consequences of his voluntary acts. *State v. Farmer,* 156 Ohio St. 214 (1951).

{¶75} The evidence at trial by the experts established the natural fall of the victim's body if he was bending over would be to fall forward. T. at 364-365, 433. As noted in Assignment of Error III, the victim was found on his back. State's Exhibit No 15A. The gun was fired at least 18 to 24 inches from the victim because of the lack of stippling. T. at 305-306, 429-430. If believed, this places the victim at least 18 to 24 inches from appellant and in an upright position.

{¶76} Appellant testified the victim was bent over him punching him. T. at 678-679. Appellant noticed his gun "had fallen out of the nightstand" and was on the floor. T. at 679. He grabbed the gun and held it underneath him as the victim continued to beat him. T. at 680-681. He then grabbed the muzzle and began swinging the gun over his shoulder in an attempt to strike the victim, but he was unsuccessful. T. at 681. Appellant then took the safety off the gun, yelled "I'm going to shoot, I'm going to shoot," held the gun next to his own head, and shot straight up in the air as a warning shot to scare off the victim. T. at 683. The bullet struck the victim in the throat. T. at 686. Appellant admitted that he "knew that there was a possibility" that the bullet could go in the victim's direction given the fact that the victim was over top him punching him. T. at 738.

{¶77} All of the actions occurred very quickly and appellant's friend, Douglas Adams, who was a guest in the apartment on the morning in question, testified there was a thud and a shot immediately after the victim entered appellant's bedroom. T. at 519-520.

{¶78} Whether or not appellant intended to injure the victim, it is clear from his testimony that he knowingly unlocked the safety to the gun and fired it in the air with appellant apparently bent over him punching him. Because a knowingly done act includes the fact that appellant was responsible for the natural, reasonable, and probable consequences of his act, we find sufficient evidence to rebut the self-defense or accidental act that caused the victim's death.

{¶79} Upon review, we find the testimony is sufficient to establish that appellant knowingly caused the victim's death.

INVOLUNTARY MANSLAUGHTER

{¶80} Appellant argues a predicate offense was not proven therefore, a felony was not involved as is required for involuntary manslaughter.

{¶81} Involuntary manslaughter as defined in R.C. 2903.04(A) states, "[n]o person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

{¶82} Neither the indictment nor the verdict forms specified the underlying felony. The trial court charged the jury with felonious assault, aggravated assault, and having a weapon while under disability. T. at 884-887. There was also a firearm specification to this count.

{¶83}  Appellant's own testimony established he fired the gun in order to stop the confrontation with the victim.  T. at 678-683.  Given the evidence cited supra, we find sufficient credible evidence of attempted felonious assault or attempted aggravated assault as a predicate offense.  Appellant's arguments that having a weapon while under disability cannot be the predicate offense are moot.

HAVING A WEAPON WHILE UNDER DISABILITY

{¶84}  Having a weapon while under disability is defined in R.C. 2923.13 as follows in pertinent part:

(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(4) The person is drug dependent, in danger of drug dependence, or a chronic alcoholic.

{¶85}  Appellant argues there was insufficient evidence of his drug dependency to create a disability.  R.C. 3719.011(B) defines a "drug dependent person" as "any person who, by reason of the use of any drug of abuse, is physically, psychologically, or physically and psychologically dependent upon the use of such drug, to the detriment of the person's health or welfare."

{¶86}  Appellant was discharged from the U.S. Army for drug dependency (failing a drug test).  State's Exhibit No. 49.  Appellant freely admitted to smoking marijuana after his discharge as it helped his anxiety and depression and to cultivating marijuana

for his personal use.  T. at 699-700, 705, 709.  We find this evidence to be sufficient to establish the disability of drug dependency.

{¶87}  Upon review, we find the jury did not lose its way and find no manifest miscarriage of justice.

{¶88}  Assignment of Error VII is denied.

VIII

{¶89}  Appellant claims he was denied effective assistance of trial counsel.  We disagree.

{¶90}  The standard this issue must be measured against is set out in *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus.  Appellant must establish the following:

2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.  (*State v. Lytle* [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; *Strickland v. Washington* [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)

3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."

{¶91}  This court must accord deference to defense counsel's strategic choices made during trial and "requires us to eliminate the distorting effect of hindsight." *State v. Post,* 32 Ohio St.3d 380 (1987), 388.

{¶92}  Appellant claims his counsel was ineffective for failing to object to the voluntary manslaughter charge to the jury.  This issue was addressed in Assignment of Error VI and denied.

{¶93}  Appellant also argues his trial counsel should have requested that the jury be charged on the "castle doctrine" in R.C. 2901.05:

(B)(1) Subject to division (B)(2) of this section, a person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

(2)(a) The presumption set forth in division (B)(1) of this section does not apply if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.

{¶94}  Both appellant and the victim lived together in the same house.  T. at 669-670.  The victim was a renter although he had not paid his rent for some months.  T. at 671.  The "castle doctrine" did not apply in this case.

{¶95} Appellant argues his counsel failed to present an expert to testify as to his post traumatic stress disorder. The trial court permitted funds for the expert (John Fabian, PSY.D, J.D., ABPP), but defense counsel chose not to have him testify. Order filed June 30, 2011. While Dr. Fabian could have testified to post traumatic stress disorder, he would have also testified to appellant's drug dependency which would have established the having a weapon while under disability count. We conclude the choice not to present the expert was within the range of trial strategy.

{¶96} Appellant also argues his counsel was ineffective for not objecting to the Wilgus, Smith, and Ugwu testimonies as they were not qualified as experts. This issue was addressed in Assignment of Error III and denied.

{¶97} Appellant also challenges his counsel's effectiveness in examining his friend, Douglas Adams. We find Mr. Adam's testimony, in most regards, substantiated appellant's case. The testimony established the victim confronted appellant, the reason for the confrontation, and the victim's attitude and combativeness. We fail to find any error or ineffectiveness in counsel's performance on this issue.

{¶98} Upon review, we find no ineffective assistance of counsel.

{¶99} Assignment of Error VIII is denied.

{¶100} The judgment of the Court of Common Pleas of Delaware County, Ohio is hereby affirmed.

By Farmer, J.

Gwin, P.J. concur and

Hoffman, J. concurs separately.

s/ Sheila G. Farmer_____

s/ W. Scott Gwin_____

_____

JUDGES

SGF/sg 1015

*Hoffman, J., concurring*

{¶101} I concur in the majority's analysis and disposition of all of Appellant's assignments of error except Appellant's sixth and eighth assignments of error. While I agree with the majority's decision to overrule them, I do so for a different reason.

{¶102} While voluntary manslaughter is an inferior degree of murder and the evidence at trial was sufficient to entitle Appellant to an instruction thereon, it was the state of Ohio, not Appellant, who requested the instruction.

{¶103} I interpret the majority's citation to *Rhodes* to suggest it finds the trial court did not error in giving the instruction. To that extent, I respectfully disagree.

{¶104} Appellant was not indicted for voluntary manslaughter. To allow the instruction other than upon Appellant's request, I find constitutes error.

{¶105} Having so found, I, nevertheless, concur in the majority's decision to overrule the assigned error because I find it was waived by Appellant because he failed to object to the instruction.

{¶106} Because the majority overrules Appellant's eighth assignment of error claiming ineffective assistance of counsel for failing to object to the instruction based upon its apparent conclusion giving the instruction was not error, I find it necessary to state my reason for concurring in the majority's disposition regarding it.

{¶107} While I find the trial court's decision to give the instruction constituted error, I find the decision not to object within the parameters of counsel's trial strategy. While it has been held the failure to request an instruction on an inferior degree offense may be the result of trial strategy, and, accordingly, not a result of ineffective counsel. See, *State v. Cottrell*, Fourth Dist. 11CA3241, 11CA3242, 2012-Ohio-4583, I find the

corollary failure to object to the instruction, likewise, might be trial strategy as it allows a jury to find a defendant not guilty of the greater indicted offense thereby allowing for the possibility of a lesser punishment on the inferior offense.  While admittedly speculation, had the state not moved for the instruction, Appellant may well have done so himself under the facts of this case.


_____

HON. WILLIAM B. HOFFMAN

[Cite as *State v. Sellers*, 2012-Ohio-5546.]

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| JOEL E. SELLERS | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 12CAA020012 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Delaware County, Ohio is affirmed. Costs to appellant.

s/ Sheila G. Farmer_____

s/ W. Scott Gwin_____

s/ William B. Hoffman_____

JUDGES